Lawrence Padway for the appellant, Rosalie Moos-Holling. I'd like to save half of my time for rebuttal. Just watch the clock, counsel. But I'd like to take a brief moment to discuss the report of Dr. Rubenstein and his finding, which essentially is that Ms. Moos-Holling is exaggerating the hypersensitivity of her thumb and forefinger. We do double blind studies in science because we know that people react differently when they know what's coming than when they don't. And that's people who are honest, incredible, whether they are patients or physicians. So that when Dr. Rubenstein says, okay, I'm going to examine your thumb and forefinger, and he says, oh, well, she withdraws it quickly now. Now it's sensitive. But later on, he says he somehow is distracting her and he finds it to be less sensitive. It's not appropriate to conclude that that's evidence of exaggeration. I think that's just the type of thing that one would expect. If you have something that's sore and somebody says, I'm about to press on the sore spot, you may well react differently than if it's examined in some other way. And we don't know, just as we don't know in the double blind study, if this difference in reaction is due to something on Ms. Moos-Holling's perception and reaction, or if this is an expectation of Dr. Rubenstein that he expects it to be different and so that's how he perceives it. It's particularly true since he doesn't really tell us how he did this distraction examination, how often he did it, and so on. So is your point that the exam was inadequate or biased or what? My point is that that is not a valid criterion to conclude that she is exaggerating. And that is the first of three points that he makes in support of that contention. Well, that wasn't the only document that the planned committee relied upon to terminate her benefits. It's at the root of all of them. But if I may, just very briefly, the second point that he made is that his grip strength numbers were different than and he thought they were volitionally very low. And they are very low. And Ms. Moos-Holling complained that he was biased in how he did that test. His test is much different than the grip strength test done by the functional capacity evaluation, which has very accurate and detailed numbers. And the plan never investigated Ms. Moos-Holling's complaint. It never asked Dr. Rubenstein even to respond to it. So I think when he says, well, the grip strength numbers aren't right, she says, yeah, they're not right because it was a grip strength test done with only three fingers, which isn't how you do it. And we have good numbers from the functional capacity evaluation. That point does not support exaggeration. And the third item he says for exaggeration is that she's got calluses on her fourth and fifth fingers and she has a tan from gardening. Well, gardening doesn't, you can garden without using your thumb and fingers. So those are the three points from which he says she's exaggerating. They're not very good, and everyone else found her credible. The administrative law judge who cross-examined her had that opportunity. Dr. Friedberg, the functional capacity evaluator. And what we have at this point is somebody who is complaining of residual hypersensitivity and pain after the more obvious objective findings in her illness have, in her injury, have healed. What was the disability standard that they were applying at this point? It was in any occupation standard. But the plan defines in any occupation disability to have a salary component equal to, I think it was 70 percent of predisability earnings. And the plan studied, while they could find lots of things that she could do, obviously, the fact that you've got some problem with your right hand does not disable you from any occupation in the generic sense. But what they found was that because of her salary requirements that, in fact, she was disabled from any occupation. And that's the plan study, and that's not disputed. So the only way they can really get her back to work is by saying, well, she can do her own occupation. And the issue there, once you take Dr. Rubenstein's exaggeration out of the mix, because that's not well documented, then what you have is you have people say, well, why can't you use voice-actuated software? Which is an excellent question. Okay. So the plan never asked Bayer whether they would allow it. The plan never asked Ms. Moose-Holling whether she could use it. Counsel, at the end of the day, the district court, Judge Ilston, applied a healthy dose of skepticism to this whole business. Is that correct? That's what she says. Well, and says in the very final paragraph, the court's analysis would proceed differently if plaintiff had been examined in mid or late 2005 by a medical professional who concluded that she continued to be disabled, or if plaintiff had submitted that evidence to Broadsbuyer and Broadsbuyer had discredited plaintiff's evidence while crediting its own expert. But that is not what happened. Plaintiff failed to comply with Broadsbuyer's reporting requirements, and those are acknowledged, and did not submit her own medical evidence when given an opportunity to do so. It was, therefore, not an abuse of discretion for Broadsbuyer to conclude that plaintiff was not disabled in October 2005. Except that she didn't respond, and she was required to. She was warned that she didn't. That is not true. Well, it's not true. When Ms. Moose-Holling was asked about the social security thing from a long time ago, 2003. Nothing that directly responded to this. When she was asked for current medical, she said, I just had a worker's comp exam by Dr. Ann Sell in February. Why don't you get it? The plan then ordered that. You don't say, why don't you get it? It requires her to come up with it. The plan. Doesn't it require her to submit the evidence? Not if the plan says they're going to do it. And the plan called the worker's comp people. They said, oh. And they said, yeah, we've got it. And then, for some reason, the plan decided, oh, this is a medical legal thing, so we don't want it. But then they didn't go back to her and say, this is what we need. What they told her is, they said, hey, we need evidence that you're seeing a doctor. And so she said, fine. Here's a note from Dr. Fasella. But what they didn't do is they never sent her Dr. Rubenstein's report. They never told her she had access to her whole file. They said, if you want, you can look at the pertinent policy documents. They never told her about anything about this discussion about voice-actuated software that they were having. I mean, they asked Bayer whether or not Bayer had a job for her. But they never specifically raised the voice-actuated software issue with Bayer. They never got a response from Bayer. And, you know, she's they go out. I mean, if you look at the denial letter, and what they've asked her to do is they've asked they asked her to come up with what they asked her to produce are objective findings. And this is at a point in time at which there are no objective findings. There's nothing that she could produce that would meet the terms of this denial letter. Because it doesn't exist. Because at that point in time, all she had left was the subjective hypersensitivity. And what kept her from working, according to this record, basically, is that nobody bothered to ask the employer whether or not they would allow her to use voice-actuated software. Counsel, you're below five minutes. You indicated you wanted to save half your time. Yes. Thank you. We'll hear from the other side. Thank you. Good morning. Jerry Schreibstein for the Defendant Appellee, Bayer Disability. Sorry, Bayer Corporation Disability Plans. I'm going to skip over standard of review, because that does not appear to be an issue that's being pressed here this morning and hit the merits of the case. With respect to the discontinuation of benefits, Ms. Halling was under what we all talk about as the any occupation portion of the plan. So at that point in time, if it were determined that Ms. Halling were able to return to her own or any occupation, the plan had a basis for terminating benefits. The critical junction point in this case is October of 2005, which is when benefits were terminated. At that point in time, there is only evidence in the record, as submitted by the plan, more particularly Dr. Rubenstein had concluded that the plaintiff could return to both her own job or any other occupation. Dr. Goldberg had done a similar review and come to a similar conclusion. On appeal, of course, the plan retained another physician, Dr. Beth Cohen, who did a peer review and came to that conclusion as well. So within focusing on the point in time when the benefits determination was made, which is the only time that's relevant for this Court, there's a unanimity of medical opinion. Ms. Halling was determined to be able to return to work both in her own job or any other occupation. Everything else that's been argued here this morning and been argued in the briefing is historical. Dr. Friedberg, if I'm pronouncing that correctly, had made initial determinations of an inability to work, but even he, and I'll direct the Court to ER 1185, in August of 2003 determined that she was released to any occupation. The Employment Accessibility Report that Mr. Padway has referenced this morning was dated May of 2004. Plaintiff states that there is a 70 percent earnings requirement under the plan. That isn't true. The Court should look at ER 899. What he's lifted is a, from a benefits pamphlet, there's a description that the plan generally considers 70 percent earnings to be comparable employment, but the plan isn't bound by that at all. The plan reserves discretion to make benefits determinations, so that's not an accurate point. With respect to the findings of Dr. Rubenstein that plaintiff is so critical of, I would direct the Court's attention to ER 878. Dr. Rubenstein concludes no objective findings to explain the illness or the condition, rather. He also lists at least eight other factors, and I'll read those briefly, that hypersensitivity is not present when the patient is distracted. Plaintiff's counsel this morning has made reference to double-blind studies, though there's nothing in the record before this Court to suggest that those double-blind studies occurred or before the plan or form any part, or should form any part of this Court's decision. Dr. Rubenstein also writes that there's no structural accounting for the odd positioning in which plaintiff holds her hand. He talks about seeing calluses at the base of fingers. There's a lack of atrophy in the joints that the plaintiff is describing as being affected. She's talking about fingers being swollen. He examines the fingers and sees no swelling, no evidence of nerve entrapment, no asymmetry of reflexes or sensations, which would explain what she's complaining of. At what point was she advised that she had a continuing obligation to submit information? Numerous times, Your Honor. She was the first reference was May of 05, at which point the plan administrator asked for proof of ongoing treatment. But then in, sorry, October of 05, she was told that her benefits were going to be terminated in 30 days if she did not submit proof of continuing disability. And what did she come up with? Nothing besides the Social Security. Michelle Maxim and Goldhammer? Yes. That was the sole thing she submitted. So she got a 30-day warning notice. That's ER 1280 through 1281. She then actually had a phone call, which we've referenced in our brief, on the record and was told that the Social Security findings would not be enough, that was ER 1447, and that she needed to submit medical documentation. So the second time around, all she submitted was her first letter and the Social Security findings again. And so that's in the record at 1138, 1139. At no time, including on her appeal to the review committee, did she ever submit any medical documentation whatsoever. The only thing she ever submits are Social Security findings and her own previous letter. Based on that record, Your Honor, and even applying the district court's heightened standard, the district court's findings are entirely reasonable and supportable on the record, and there's nothing within the record which would suggest any other outcome, either of her claim or for Mr. or for plaintiff's appeal. I'll answer any other questions, but that summarizes my points. No questions. Thank you. Mr. Padway, you have a little bit of time left. What the denial letter says is that in our phone conversation on October 18th, we discussed the need for documented medical findings in order to give your claim further considerations. But it doesn't tell her, given that we're in a stage where there are no objective findings, because the objective findings end in June of 2003, so all we have after that are things which cannot be documented medical findings. What she has is she has residual complaints of pain and hypersensitivity. And none of this tells her what she needs to do. They don't offer her, as they are required to, access to all of the relevant documents. They simply say, in preparing your appeal, you or your representative may request review pertinent policy documents. I mean, that doesn't meet 29 CFR 2560.503. So she's not even given the proper procedures on how to do an appeal. And she's not represented by counsel. But I think, you know, there's another issue here, and it's one which goes way beyond this case, because it's just a big issue in most of these ERISA cases, which is that the administrative record. Is this an issue that you brought to us in your brief, or is this something new? Yes. No, this is in the brief. You can't tell from the administrative record what the review committee saw and didn't see. You can't tell what rules they were operating under. You can't tell how they were appointed. And the example that we used is, is they're required to give you a non-deferential review under the Labor Code section. That's 29 CFR 2560.503. So they can't defer to Brodsky and their findings. And there is nothing in this record that says that they have a rule or a procedure or anything else where they will give you a non-deferential review. And this is, I mean, this is just really running through this whole area of law. Because, you know, with an agency review, you know, there are rules and procedures and guidelines and precedents. And in ERISA, everything is unique because every plan is different. But because every plan is different, the administrative record needs to tell you things that we briefed. For example, Bexar Corporation has discretion. There's nothing in the writing where Bexar Corporation says, I'm giving my discretion to Bexar Corporate Services, which is now the plan administrator. There's something from Bexar Corporate Services. But if I'm giving you discretion, I should be the one who signs something in writing to do that, and I should have some rules on what that discretion is. That needs to be in the record. And there's no law, really no law in ERISA on what has to be in the record. So what you get in a typical ERISA record is you get the claim file, and maybe you get the insurance policy if there is one. You're lucky if you get the summary plan description. And what you should have in the administrative record is you should have all the plan documents. You should have, particularly where you have a committee like this, do they have a rule which would allow her to go and talk to the committee? Who knows? Does the committee review all of the documents or part of the documents or any of the documents? And which documents? And if you don't have those rules in the administrative record, then how does the court review what the committee did? I mean, all that happened in this case is at the end of the day, there's an unsigned letter saying the ERISA review committee met and made a decision, and here's what they decided. It doesn't have a person's name. I mean, we had to do discovery to try and find out who was on the committee. By the time we did, you know, we were too late to get any depositions or find out what any of those rules are. And I think that's an issue that runs not just in this case. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Trott, Paez